In the Matter of ARBITRATION BE-
TWEEN PROMOTORA DE NAVE-
GACION, S.A. Petitioner,

and

SEA CONTAINERS, LTD., Strider
9 Ltd., and Strider 10 Ltd.,
Respondents.

In the Matter of The Arbitration Be-
tween Strider 9 Ltd. and Strider
10 Ltd., Petitioners,

and

Promotora De Navegacion,
S.A., Respondent.

Nos. 00 Civ. 3374(GEL),
00 Civ. 3424(GEL).

United States District Court,
S.D. New York.

Nov. 16, 2000.

Bruce A. McAllister, Steel Hector & Davis, West Palm Beach, FL, (John C. Koster, Jack Greenbaum, Healy & Baillie, New York City, of counsel), for Petitioner/Respondent Promotora De Navegacion, S.A.

Richard W. Reinthaler, New York City (Helena Tavares Erickson, Dewey Ballantine, New York City, of counsel), for Respondent Sea Containers, Ltd.

Michael G. Chalos, Oyster Bay, NY, (Owen F. Duffy, the Chalos Law Firm, New York City, of counsel), for Respondents/Petitioners Strider 9 Ltd., and Strider 10, Ltd.

*AMENDED OPINION AND ORDER*

LYNCH, District Judge.

Petitioner Promotora de Navegacion, S.A. ("Promotora") moves pursuant to Sections 9 and 207 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), to confirm an arbitration award rendered in its favor on March 17, 2000. Respondents Sea Containers Ltd. ("SCL"), and Strider 9 Ltd. and Strider 10 Ltd. (the "Strider Subsidiaries"), oppose confirmation on independent grounds. On June 30, 2000, Judge Richard M. Berman of this Court consolidated the briefing schedule for the above-entitled matters.[1] Oral argument was held on October 19, 2000.

For the reasons discussed below, the arbitration award is confirmed as to the Strider Subsidiaries only.

## BACKGROUND

### The Parties

SCL is a Bermuda company engaged in the marine passenger transport, and marine container leasing businesses. (Calvert Aff. ¶ 2.) The Strider Subsidiaries are two of SCL's vessel-owning subsidiaries, also incorporated under the laws of Bermuda. (*Id.* ¶ 3.) Promotora is a Panamanian company principally engaged in the business of shipping bananas from Costa Rica to the United States. (*Id.* ¶ 5.) Promotora is itself a wholly owned subsidiary of Flota Mercante GranColombiana, S.A. ("FMG"), a shipping company incorporated under the laws of Colombia. (*Id.*) The practice of establishing separate legal entities, such as Strider 9 and Strider 10, to own and operate individual vessels is commonplace in the maritime industry. (*Id.* ¶ 3.)

---

1. In Dkt. No. 00 Civ. 3374, Promotora moves to confirm the arbitrators' award against all three entities, which interpose their various objections. In Dkt. No. 00 Civ. 3424, the Strider Subsidiaries move to vacate in part and modify or correct the award as to them. Since both actions concern the interpretation and enforcement of the same arbitration award, they are properly consolidated for briefing and resolution.

### The Time Charters

In 1986, FMG and SCL entered into two time charters through their respective subsidiaries. (Duffy Aff. Exs. B & C) ("Charters"). Specifically, FMG caused its subsidiary Promotora (as "Charterer") to enter into the Charters with the Strider Subsidiaries as "Owners" of the vessels Strider Isis and Strider Juno. (McAllister Aff. ¶ 3.) The Charters list only the Strider Subsidiaries as "Owners," and only Promotora as "Charterer." (Charters at lines 3 & 25.) The initial charter term was twelve months, but was extended through various amendments, each of which were signed by Promotora and the Strider Subsidiaries only. (Duffy Aff. Exs. D & E.) The last of the charter amendments expired in 1994.

Most pertinent for purposes of the present motion is Charter Clause 17, which contained the following arbitration provision:

> Should any dispute arise between Owners and Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties herein, and the third by the two so chosen; their decision or that of any two of them, shall be final and for the purposes of enforcing any award this agreement may be made a rule of the Court. The arbitrators shall be commercial men conversant with shipping matters.

(Charters at lines 213–18) ("Clause 17").

The charter party was performed without difficulty through August 1992. Throughout that period, some of the documents exchanged pursuant to the Charters were directed to, and emanated from, SCL's headquarters in London. These communications included letters signed by James B. Sherwood, President of SCL, referring to Promotora as "our valued charterers" (McAllister Aff. Ex. 3D at 3), and a telex from SCL representatives referring to SCL as "Owners of these vessels [Strider Isis and Strider Juno]" (Id. Ex. B). Promotora cites these documents as evidence of SCL's intention to bind itself to the Charters, notwithstanding that SCL was never a signatory to any of its provisions. SCL contends that most of these documents emanated from Sea Containers Services Ltd. ("SC Services"), or SC Chartering Ltd. ("SC Chartering"), each of which are wholly-owned subsidiaries of SCL, and which throughout the charter period were responsible for providing legal and administrative services to the Strider Subsidiaries. (Calvert Aff. ¶ 4.) SCL also cites Charter Clause 72 which required that "all correspondence" with the "Owners" be sent "c/o Sea Containers" in London. (Id. ¶ 15.) As for the handful of documents on the letterhead of SCL, SCL claims that these letters indicate nothing more than routine professional courtesies to a dissatisfied customer. (Id. ¶ 22.)

### The Turbana/Promotora Arbitration

Beginning in 1992, the Strider vessels failed to perform in the manner specified under the Charters, causing Promotora to incur liabilities to the Turbana Corporation, a third-party producer, buyer and seller of bananas. (Duffy Aff. ¶ 6.) In 1990, Promotora had entered into a Contract of Affreightment ("COA") with Turbana under which Promotora promised to charter the Strider vessels and make weekly voyages with 160 forty-foot containers of bananas, leaving Mondays from Costa Rica and docking the following Monday at Wilmington, Delaware. (Id. Ex. G at 2.) Turbana cancelled the COA in December 1992 after Promotora failed to meet the guaranteed delivery schedule, and arbitration followed. By award dated August 22, 1996, a panel of arbitrators found Turbana justified in its canceling the COA because the Strider vessels performed slower than promised, but rejected Turbana's claim for consequential damages on grounds that "the claimed damages were not reasonably within the contemplation of the parties" when the COA was executed. (Id. at 22.) The Strider Subsidiaries cite that finding to contest the award of consequential damages against them in the present proceeding.

## The Present Controversy

The controversy before this Court began in December 1996, when Promotora sent a letter addressed to "Sea Containers Ltd.," "Strider 9, Ltd." and "Strider 10, Ltd." stating that Promotora sought to commence arbitration proceedings "pursuant to Clause 17 of the Time Charters of the STRIDER ISIS and STRIDER JUNO." (Calvert Aff. Ex. 2.) Promotora claims (on a number of grounds) that SCL should have been on notice that it was to be a party to the arbitration. SCL disagrees since "the letter on its face sought to commence an arbitration proceeding pursuant to Clause 17 of the time charters, to which only Strider 9 and Strider 10 were parties." (*Id.* ¶ 15.) Upon receipt of Promotora's letter demanding arbitration, Mr. Philip A. Calvert, the Director of Legal Services for SC Services (*Id.* ¶ 1), retained the Chalos Law Firm (formerly Chalos & Brown) to defend the Strider Subsidiaries, (*Id.* ¶ 16). On December 27, the Chalos Law Firm, acting as attorneys for "Owners of the Strider ISIS and STRIDER JUNO," responded to Promotora's demand as follows:

> In reply to your letter dated December 20, 1996 naming Mr. Berg as Promotora's arbitrator pursuant to the arbitration clauses of the STRIDER ISIS and STRIDER JUNO Charterparties dated 21 November, 1986, please be advised that Owners hereby appoint Mr. Manfred Arnold as Owners' arbitrator under both Charterparties.

(*Id.* Ex. 3.)

The arbitration proceeding lasted sixteen days. Throughout, it appears that the Chalos Law Firm formally undertook to represent the Strider Subsidiaries only. (*Id.* ¶¶ 16, 18.) No appearances were entered on behalf of SCL, nor were any pleadings or documents signed in SCL's name. But those facts are clouded by others: (1) the Chairman of the Panel opened fifteen of the sixteen hearing days by naming "Sea Containers and its subsidiaries as respondent" (McAllister Aff. Ex. Tr. at 6–7); (2) on the first hearing day Promotora's attorney stated on the record that the arbitration concerned "disputes which have arisen between my clients, Promotora, and ... Sea Containers, and the registered owners of the vessels—Strider No. 9 and Strider No. 10" (*Id.* at 5);[2] (3) on one occasion, counsel of record for the Strider Subsidiaries referred to "Sea Containers and its subsidiaries" as parties to the arbitration (Koster Aff. Ex. Tr. at 1); and (4) throughout the proceeding, the term "Sea Containers" was repeatedly used by the arbitrators when referring to the Strider Subsidiaries. Neither counsel of record for the Strider Subsidiaries nor Mr. Calvert, who was present (but did not formally appear) at several of the hearings, objected to these on-the-record references, which Promotora cites as evidence of SCL's "acquiescence" to the arbitration. (Mem. Supp. Pet. Confirm at 10.) It is uncontested, however, that the issue of SCL's liability for the debts of its subsidiaries was never submitted, briefed, nor argued to the arbitrators.

## The Award

After sixteen days of hearings, a divided panel issued an award of nearly $7 million in favor of Promotora. (Duffy Aff. Ex. G) ("Award"). Of that total, $6.2 million represents Promotora's consequential damages stemming from its "lost profits" on account of Turbana's cancellation of the 1990 COA. The Award itself is unclear as to the parties against whom the damages are awarded. The operative language of the Award provides that "Sea Containers is directed to pay [the amount awarded] to Promotora." (Award at 15.) However, throughout the body of the Award, "Sea Containers" appears to refer to the Strider Subsidiaries, and not to SCL, as demon-

---

2. Adding to the confusion, counsel for Promotora in the next sentence said, "And I will refer to them collectively as Sea Containers."

strated by its introductory paragraph, which specifically so defines that term:

> The claims, which are the subject of this arbitration, arise out of two ... Time Charter Parties dated November 21, 1986 between Promotora de Navegacion, S.A. (hereinafter "Promotora" or "Charterer") as charterer and *Strider 9 Limited and Strider 10 Limited (hereinafter collectively referred to as "Sea Containers" or "Owner"*) as owner of the M/V Strider Isis and M/V Strider Juno.

(Award at 1) (emphasis added.) On the other hand, at least two passages in the arbitrators' opinion are entirely ambiguous as to the intended reference of "Sea Containers" (Mem. Supp. Pet. Confirm at 15), and the caption of the Award plainly lists as the respondent: *"Sea Containers, Ltd.* as Owner of the STRIDER ISIS and STRIDER JUNO," (Award at 1) (emphasis added). Promotora now moves to confirm the award against the Strider Subsidiaries and SCL. SCL claims that it cannot be bound by the Award because SCL was never a party to the Charters, nor to the arbitration brought pursuant to Clause 17. The Strider Subsidiaries argue that the consequential damages portion of the Award should be vacated because they could not have foreseen being held liable to Promotora for losses resulting from the termination of the Turbana COA.

For the reasons that follow, (1) SCL's motion to vacate the Award as applied against them is granted, and (2) the Strider Subsidiaries' motion to vacate the consequential damages portion of the award is denied.

**DISCUSSION**

■ On a confirmation motion, judicial review of an arbitral award is "quite limited." *Local 1199, Drug, Hosp. & Health Care Employees Union v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir.1992). An arbitral award will be confirmed unless (1) one of the statutory exceptions listed in 9 U.S.C. § 10 applies, (2) the arbitrators acted in manifest disregard of the law, or (3)

the arbitral award is incomplete, ambiguous or contradictory. *See Chios Charm Shipping Co. v. Rionda*, No. 93 Civ. 6313(SS), 1994 WL 132141 (S.D.N.Y. April 12, 1994). The central issues to be addressed in this opinion are first: whether the arbitrators exceeded their powers, in violation of 9 U.S.C. § 10(a)(4), in determining (to the extent that they did) SCL's obligations under the Charters; and second: whether the arbitrators acted in manifest disregard of the law in awarding Promotora consequential damages for the loss it sustained when Turbana cancelled the final year of the COA.

*A. Confirmation Against SCL*

■ "Commercial arbitration is a creature of contract," *National Broadcasting Co., Inc. v. Bear Stearns & Co., Inc.*, 165 F.3d 184, 189 (2d Cir.1999), and a person "cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *Thomson–CSF, S.A. v. American Arbitration Association*, 64 F.3d 773, 776 (2d Cir.1995). Accordingly, contractual submission to arbitration is generally a pre-condition to enforcement of any arbitration award. *See AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."); *Brooks Drug Co.*, 956 F.2d at 25 ("[T]he scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission.") (internal quotation marks omitted). Absent an "explicit commitment" to arbitrate, *Continental Group, Inc. v. NPS Communications, Inc.*, 873 F.2d 613, 617 (2d Cir.1989), an award will not be confirmed against a person who has not "clearly and unambiguously demonstrated an intent to be bound by the arbitral proceeding." *Chios*, 1994 WL 132141, at *3 (citing *Gvozdenovic v. United Air Lines*, 933 F.2d 1100, 1105 (2d

Cir.1991)). Thus, the fundamental question here is whether SCL evidenced—expressly or implicitly—an unambiguous intent to arbitrate the submitted dispute against Promotora.[3]

If the record is clear on anything in this case, it is that SCL never signed an arbitration agreement. Clause 17 is the only arbitration provision at issue, and it states that all disputes arising under the Charters "between Owners and Charterers" shall be submitted to arbitration. Promotora does not contest that the Strider Subsidiaries, and not SCL, are defined as "Owners" under the Charters, nor that SCL is not a signatory to the Charters or their various amendments. Instead, it relies on various theories of liability that allegedly stem from SCL's conduct in the course of the charter party agreement and the proceedings below.

The precise language of Clause 17 must be the starting point for analysis. It is generally the rule that "a party who signs a written contract is conclusively presumed to know its contents and to assent to them, and he is therefore bound by its terms and conditions." *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 46 (2d Cir. 1993). And courts in this circuit are loathe to "ignore ... language of agreements freely entered into by two sophisticated parties." *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 16 (2d Cir.1993). The parties before me are as sophisticated as they come: Promotora is a wholly owned subsidiary of FMG, the largest shipping company in Colombia (Duffy Aff. Ex. G at 1); Sea Containers is a Bermuda corporation with extensive experience in the shipping trade, as evidenced by its history of litigation in this and other federal courts. *See Benita Sanchez Vda. v. Sea Containers, Ltd.,* 874 F.2d 66 (1st Cir. 1989); *Stena Line (U.K.) v. Sea Containers, Ltd.,* 758 F.Supp. 934 (S.D.N.Y.1991); *De Cosme v. Sea Containers, Ltd.,* 600 F.Supp. 42 (D.Puerto Rico 1984). Thus, an argument (by either side) that one party was somehow led to believe that another party was (or was not) a party to the arbitration proceeding, in the face of the plain terms of the Charters, must be supported by some compelling evidence.

No such evidence can be found on this record. Promotora argues that despite the plain terms of Clause 17, SCL should be bound to the Award on the alternative grounds (1) that the terms of the Charters were "incorporated by reference" into a 1990 Letter of Agreement signed by SCL; (2) that SCL's conduct throughout its transactions with Promotora and during the arbitration proceeding, demonstrated an intent to be bound by the Panel's findings; or (3) that SCL and the Strider Subsidiaries conducted themselves as alter ego entities throughout the charter performance and, as such, should be liable for the obligations of one another. Promotora is correct that Clause 17 is not the end of our inquiry, and that in "limited circumstances ... [a] non-signatory may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency." *Thomson–CSF,* 64 F.3d at 776. But while Promotora's arguments have some plausibility, on the record as a whole, they do not overcome the presumption against confirming an arbitral award against a party that clearly was *not* a signatory to the only contract underlying the dispute at issue.

**3.** There is also a threshold question of whether there even *is* an award to be confirmed against SCL. SCL suggests that because the Award is at best ambiguous in its references to SCL as a party (*see supra* at pp. 6–7), there is no fair reading of the award that would permit confirmation against them. (Mem. Supp. Mot. Correct & Vacate at 4.) However, the ambiguity exception to confirmation of an arbitration award is "strictly limited." *Transit Cas. Co. v. Trenwick Reinsurance Co., Ltd.,* 659 F.Supp. 1346, 1350 (S.D.N.Y.1987). It is unnecessary to decide whether that exception applies in this case since, assuming *arguendo* that the arbitrators did intend to enter an award against SCL, confirmation fails on other grounds.

### 1. Incorporation by Reference

In addressing claims that a non-party to an arbitration clause intended to arbitrate by reference to a separate agreement, courts in the Second Circuit draw a distinction between "restrictively worded" and "broadly worded" arbitration provisions. *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 48 (2d Cir.1993). The former (narrow) type of provision generally "does not bind a non-party, notwithstanding words of incorporation or reference in a separate contract by which that non-party is bound." *Id.* By contrast, "a broadly worded arbitration clause that is not restricted to the immediate parties ... may be effectively incorporated by reference into another agreement." *Id.* There is no question in this case that the terms of Clause 17 expressly restrict arbitration under the Charters to disputes between its two immediate parties, Promotora and the Strider Subsidiaries. Thus, absent a showing that Sea Containers unambiguously intended to modify (or submit itself to) an arbitration clause which expressly excludes them from the universe of parties subject to arbitration, Promotora's incorporation by reference argument must fail. *See e.g., Import Export Steel Corp. v. Mississippi Valley Barge Line Co.*, 351 F.2d 503, 506 (2d Cir.1965) (where time charter provides for arbitration between "Owners and Charterers," a third party cannot be compelled to arbitrate despite its signing a bill of lading which incorporated the time charter by reference); *Intertec Contracting v. Turner Steiner International, S.A.*, No. 98 Civ. 9116(CSH), 2000 WL 709004 (S.D.N.Y. May 31, 2000) (non-party to an arbitration agreement cannot be compelled to arbitrate under incorporation theory where "a rational reading of the General Contract demonstrates that the arbitration agreement ... is restricted to the immediate parties to that contract").

Promotora's principal evidence of incorporation is a July 16, 1990, Letter of Agreement between Promotora, FMG and SCL, that was executed "For and on behalf of Sea Containers Ltd." ("LOA"). (McAllister Aff. Ex. 7A at 1–2.) Promotora claims that the LOA "clearly confirms and incorporates all the terms of the charterparties including the arbitration clauses, and [that] SCL bound itself to those terms including the arbitration clauses." (Mem. Supp. Pet. Confirm at 6.) I am not so sure. The purpose of the LOA appears to have been to memorialize the terms of a non-binding agreement to amend some particulars of the original Charters by way of reduced leasing rates. (Calvert Aff. ¶ 25.) Specifically, the letter states that

[i]n order to induce Turbana Corporation to proceed with [the COA], SC has agreed to a reduction in the total amount to be paid by PN to SC over the three year contractual period of $1,400,000. This reduction will be set against the vessel charter payments ... in accordance with the addenda to the charter parties dated July 16th 1990 and to the lease agreement dated October 4th 1990.

(McAllister Aff. Ex. 7A at 1.) The LOA does *not* state, however, that any of its signatories intend to incorporate anything by reference; to the contrary, after describing the two specific changes to be made to the Charters, the LOA confirms that *"all other terms and conditions of the charter parties and container leases remain unchanged." (Id.)* (emphasis added.) Promotora cites that sentence as evidence that all charter terms were incorporated into the LOA. A more persuasive reading of the papers, however, is that the LOA memorializes an "agreement to agree" to change a few particulars of the Charters, but otherwise left their status quo intact. That reading is supported by the telling fact that the amendments themselves—the only documents that actually modified anything—were signed on behalf of the original contracting parties—Promotora and the Strider Subsidiaries—and nobody else. (Duffy Aff. Exs. B, D & E.)

Unfortunately, the LOA upon which Promotora relies is hardly a model of precise draftsmanship, and reasonable persons may differ as to what its signatories had in mind. But it is common ground (1) that the LOA nowhere states it intends to be self-executing; (2) that Promotora's papers do not contest that the documents which effectively modified the Charters are the attached amendments themselves; and (3) that those amendments (like the original Clause 17) make no mention of SCL. Further, the issue of "incorporation by reference" is nowhere to be found in the transcript of the sixteen-day arbitration hearing; if it was, the policies weighing in favor of SCL at this stage of the controversy might not weigh as heavily as they do now. On this record, however, given the restrictive terms of Clause 17, the law of this Circuit that counsels against incorporating such language into a separate agreement with a non-party, and the relatively equal bargaining positions of the parties, any ambiguities must be construed in favor of SCL. *See, e.g., Intertec Contracting,* 2000 WL 709004, at *7 ("Second Circuit jurisprudence does not 'indicate that a non-signatory can be bound to an arbitration agreement with *less than a full showing* of some articulable theory under contract or agency law' ") (quoting *Thomson–CSF,* 64 F.3d at 780 (emphasis added)).

Accordingly, I conclude that the Letter of Agreement between FMG, Promotora and Sea Containers does not incorporate by reference the terms of the Clause 17—or any other charter provision—to which only Promotora and the Strider Subsidiaries are signatories.

2. Intention to Arbitrate

■ A non-signatory to an arbitration clause may be bound by an arbitral award if in the course of the arbitration proceeding, or in its dealings with parties to the arbitration, its conduct demonstrates an intent to arbitrate the submitted dispute. *See Gvozdenovic v. United Air Lines, Inc.,*
933 F.2d 1100, 1105 (2d Cir.1991); *Chios,* 1994 WL 132141, at *3. Such intent, however, must be *"clearly and unambiguously demonstrated." Chios,* 1994 WL 132141, at *3 (citing *Gvozdenovic,* 933 F.2d at 1105) (emphasis added). For example, the Second Circuit in *Gvozdenovic,* found the requisite intent to arbitrate where a non-signatory to an arbitration clause "actively and voluntarily" participated in the arbitration proceeding, chose and funded a committee to represent them at hearings, yet never objected to the proceeding, nor sought judicial intervention to halt it. *Id.* at 1105. Similarly, the court in *In Matter of Petition of Transrol Navegacao, S.A.,* 782 F.Supp. 848, 851 (S.D.N.Y.1991), found the requisite intent where (1) there was "no question" as to whether a non-party to an arbitration clause "initially intended to arbitrate" the submitted dispute, and (2) the non-party had invoked the clause as a defense in a separate proceeding. *Id.*

■ Similar facts are not found on this record. Promotora's letter demanding arbitration was addressed to SCL (as the Charters required), but it clearly invoked Clause 17, to which SCL was not a party. Specifically, the letter stated that "Promotora is now ready to initiate arbitration proceedings *pursuant to Clause 17* of the Time Charters.... We hereby give notice of Promotora's appointment of Mr. Jack Berg ... [as] its arbitrator *pursuant to Clause 17* of the Strider Isis and Strider Juno charter parties." (Calvert Aff. Ex. 3) (emphasis added.) Given the plain terms of Clause 17, it cannot be credibly claimed that SCL was on notice that Promotora clearly intended to submit to arbitration a dispute pursuant to that Clause against *SCL.* The more plausible reading of the documents credits the understanding of Mr. Calvert: "Because the letter on its face sought to commence an arbitration proceeding pursuant to Clause 17 of the time charters, to which only Strider 9 and Strider 10 were parties, neither I nor anyone else on behalf of SCL, SC Services or the Strider companies ever viewed the let-

ter as seeking to commence an arbitration proceeding against SCL." (Calvert Aff. ¶ 15.) Promotora asserts that many of the documents exchanged subsequent to its December 20th letter support its claim as to SCL's intentions. But the force of those letters remains clouded by Charter Clause 72, which required that "all correspondence" to the "Owners" (the Strider Subsidiaries) be sent "c/o Sea Containers" in London. And none of the documents come close to demonstrating SCL's clear and unambiguous intent to arbitrate.[4]

Promotora further argues that SCL participated by "acquiescence" in the arbitration hearings. It builds its case on transcript excerpts of the Panel Chairman opening each hearing day with some permutation of the following introduction:

> Let the record show that today is April 15, the second hearing in the matter of the arbitration between Promotora de Navegacion, time charterer, and Sea Containers and its subsidiaries as respondent.

(McAllister Aff. Ex. Tr. at 5.) The Chalos Law Firm on behalf of the Strider Subsidiaries never objected to these record description of the parties; nor did Mr. Calvert, who attended several of hearings. (Calvert Aff. at ¶ 18.) Elsewhere in the transcript, Promotora's attorney stated that the proceeding was submitted to resolve "disputes which have arisen between my clients, Promotora, and ... Sea Containers, and the registered owners of the vessels—Strider No. 9 and Strider No. 10." (McAllister Aff. Ex. Tr. at 7.) It is undisputed that nobody objected to these references at any time during the sixteen days of hearings, and that at one point (but only one) counsel of record for the Strider Subsidiaries referred to SCL as a party to the arbitration. (Koster Aff. Ex. Tr. at 1.)

From these excepts, Promotora cites *Gvozdenovic* and maintains that the failure on behalf of Mr. Calvert or attorneys from the Chalos Law Firm to object to on-the-record descriptions of SCL as a party to the arbitration demonstrates SCL's "acquiescence and participation" in the proceedings. (Mem. Supp. Pet. Confirm at 10). But I find the record proceedings in this case closer to *Chios* than to *Gvozdenovic*. The court in *Chios* refused to confirm an arbitral award against a non-party to a time charter on grounds that the non-party's conduct was (at best) ambiguous. 1994 WL 132141, at \*3–4. There, as here, notice of intent to arbitrate was addressed to a non-party affiliate of the charter party, who responded by appointing an arbitrator "on behalf of charterers." *Id.* at \*1. There, as here, during the course of the arbitration, the non-party affiliate never appeared and never objected to the proceeding going forward. *Id.* at \*4. The panel then proceeded with the arbitration and rendered an award against the charterer which the owner sought to confirm as to the charterer and its non-party affiliate. The court declined to do so on grounds that neither the appointment of an arbitrator nor any other conduct by the affiliates "during the arbitration demonstrated the

---

4. The principal documents cited by Promotora include two letters from James Sherwood responding to Promotora's complaints, and a series of exchanges between Promotora and employees of SC Services regarding the operation and maintenance of the vessels. (McAllister Aff. Ex. 3D & 7A; Koster Aff. & Exs.) These isolated documents, however, give no indication of SCL's intent to arbitrate, let alone a clear intent to do so. Nor do any of the documents come close to undermining the plain language of Clause 17, which makes no mention of SCL, and which is restricted on its face to disputes between the Strider Subsid- iaries and Promotora. Promotora also cites a telex from SCL advising Promotora that the Strider vessels were to be sold to an unrelated third party. (McAllister Aff. Ex. C.) But the operative documents confirm that Promotora agreed to amend the Charters to provide that all references to "Owners" shall thereafter refer to the "Disponent Owners," *i.e.* the Strider Subsidiaries. (Calvert Aff. Ex. 4.) Having freely entered into that amendment (signed only by representatives from Promotora and the Strider Subsidiaries), Promotora cannot now claim that the sale of the vessels bound SCL.

requisite clear an unambiguous intent [on their part] to arbitrate." *Id.* at *4.

Though there is more in this record suggesting SCL's intentions than was before the court in *Chios,* there is not much more, and I am unable to conclude that the record as a whole demonstrates SCL's "clear and unambiguous intent" to arbitrate. SCL did not "actively and voluntarily participate" in the arbitral proceedings, as was the case in *Gvozdenovic,* 933 F.2d at 1105. Nobody representing SCL, for example, entered an appearance or signed any pleadings or documents in SCL's name. The Chalos Law Firm defended the merits of the dispute on behalf of the Strider Subsidiaries, but was never authorized to (and did not) appear on behalf of SCL. *Compare Gvozdenovic,* 933 F.2d at 1105 (finding a "clear intent to arbitrate" on behalf of party who "chose [and paid for] a committee to represent them in the arbitration").

The arbitration proceeding progressed with a troubling lack of formality, and I do not doubt that the parties at times played games with one another. But the parties before me are sophisticated corporate entities and repeat players in these games.[5] If Promotora wished to include SCL as a party to the arbitration (or to insure that SCL intended to proceed as a party), it could have done so—on a motion in this Court to compel SCL's participation, through a letter addressed to SCL asking for clarification of SCL's intentions, or by asking the panel arbitrators themselves for an on-the-record clarification of whom they regarded as the parties before them. The dispute that underlies this case began in 1996, and it is telling that despite the lack of firm evidence on either side, arguments regarding SCL's liabilities for the debts of its subsidiaries under the Charters were never submitted to the arbitrators. If SCL were actively participating in the arbitration, one would expect it to have raised such obvious arguments.

It is perhaps plausible to infer from this record, as Promotora urges, that SCL intended to submit to the arbitral proceeding, and that its motion to vacate the Award in this Court amounts to a second bite at the apple; but it is at least as plausible to infer that Promotora was unsure of SCL's intentions yet strategically chose not to move to compel their participation because such a motion might have failed. Unfortunately for Promotora, the law requires certainty where the record provides ambiguity, and remaining ambiguities at this stage of the controversy cut in favor of SCL. Whether or not Promotora understood SCL to have been proceeding as a party to the arbitration (and they may very well have), the showing that is required on a motion to confirm an award is a *clear and unambiguous* intent on the part of SCL to arbitrate. That cannot be demonstrated on this record.

For these reasons, I conclude that neither the documentary evidence in this case, nor the conduct of Mr. Calvert or attorneys of record from the Chalos Law Firm during the arbitration, demonstrates the requisite clear and unambiguous intent on the part of SCL to arbitrate the submitted dispute.

### 3. Alter Ego

■ A motion to confirm an arbitral award is generally an inappropriate occasion for a district court to consider an alter ego theory of liability. The leading case is *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.,* 312 F.2d 299 (2d Cir.1963), in which the Second Circuit squarely held that an action to confirm an arbitration award cannot be substituted to enforce an award under an alter ego theory. The *Orion* court reasoned that:

**5.** This fact alone distinguishes the case from *Gvozdenovic,* which involved labor, not commercial arbitration. The *Gvozdenovic* court expressly distinguished the two, stating that "[u]nlike a standard commercial contract, a

collective bargaining agreement binds both those members within a bargaining unit at the time the agreement is reached as well as those who later enter the unit." 933 F.2d at 1105.

An action for confirmation is not the proper time for a district court to pierce the corporate veil. The usual office of the confirmation action under 9 U.S.C. § 9 is simply to determine whether the arbitrator's award falls within the four corners of the dispute as submitted to him. *The action is one where the judge's powers are narrowly circumscribed and best exercised with expedition.* It would unduly protract the proceedings were the court to be confronted with a potentially voluminous record setting out details of the corporate relationship between a party bound by an arbitration award and its purported "alter ego."

*Id.* at 301 (emphasis added). This statement exemplifies the need to guarantee that arbitrations, and motions to confirm arbitration awards, be resolved expeditiously. The availability of other remedies, including the motion to compel and separate proceedings in the district court to determine the liability of persons not party to the arbitration, ensure that expeditious confirmation proceedings do not unduly prejudice the moving party. *See Builders Federal (Hong Kong), Ltd., v. Turner Constr.,* 655 F.Supp. 1400, 1402, 1406–08 (S.D.N.Y.1987).

Promotora is correct that *Orion* is not a total bar to confirmation of an award against a non-party. The most noted exceptions to its rule apply in actions involving employment contracts, *see Gvozdenovic,* 933 F.2d at 1105, or where the record demonstrates that the non-party manifested an unambiguous intent to arbitrate their dispute, *see Chios,* 1994 WL 132141, at *3, as already discussed. In those situations the facts are often clear enough to allow the court to parse the record yet still proceed with expedition. But where the movant alleges alter ego as grounds for liability, it generally cannot be said that "the simplicity of the factual determination called for ... indicates that the reasons for denying the propriety of making such a finding in *Orion* are absent." *In Matter of Arbitration between Bowen,* No. 91 Civ. 4673(CSH), 1992 WL 73480, *8 (S.D.N.Y. April 2, 1992). The question of alter ego is a uniquely fact sensitive one and courts in this Circuit are "extremely reluctant" to disregard corporate form. *United States v. Funds Held in the Name or for the Benefit of Wetterer,* 210 F.3d 96, 106 (2d Cir.2000). Thus, especially where the record is voluminous and fragmented, questions of alter ego are generally inappropriate for resolution on a motion to confirm. *See, e.g., Schiavone Constr. Co. v. Impresit–Girola–Lodigiani Inc.,* 1992 WL 88178, at *5 (S.D.N.Y. April 20, 1992) (dismissing under *Orion* part of complaint seeking enforcement of award where facts were in dispute and required an accounting).

In this case, the issue as to whether the Strider Subsidiaries were acting as SCL's alter ego was never submitted to the arbitrators, and the evidentiary record is consequently undeveloped on matters that would be critical to an expeditious alter ego analysis. To begin with, it is unclear whose alter ego law should apply. SCL argues that if alter ego were to become an issue (which they do not concede) Bermuda law—which permits veil-piercing only in extraordinary circumstances—may apply. (Mem. Supp. Mot. Correct & Vacate at 24 & n. 29.) Promotora relies on general principles of maritime law which they cite as more forgiving. (Mem. Supp. Pet. Confirm at 10–11; *but see Chios,* 1994 WL 132141, at *4 n. 3 (noting that in a maritime controversy "[a]n alter ego theory requires substantial evidence ... that corporate identities were disregarded")). Under either standard, however, the record is entirely devoid of evidence on such matters as (1) whether SCL used the vessels owned by the Strider Subsidiaries for its own purposes; (2) whether the Strider Subsidiaries observed corporate formalities; (3) whether the officers and directors of the Strider Subsidiaries overlapped with those of SCL; (4) whether funds or assets were intermingled; or (5) whether the Strider Subsidiaries displayed their own judgment and discretion in running their

operations. Whatever the answers to these questions (and others like them) may be, it is clear that they were not, as *Orion* requires, "within the four corners of the dispute" submitted to the arbitrators—who made no mention of corporate identities in their award—and that a protracted evidentiary hearing would thus be required to resolve them.

*Orion* counsels against proceeding that way, and I accordingly hold that the present motion to confirm is not the proper procedural stage for Promotora to raise its alter ego claim. I take no view on the merits of that claim, however. Should Promotora wish to pursue this theory of liability further, it may do so in a court of competent jurisdiction.

### B. *Confirmation Against the Strider Subsidiaries*

The analysis of SCL's claim that it was not a party to the arbitration was guided by the principle that arbitration is a creature of contract, and by my finding that this record does not demonstrate SCL to have contracted to arbitrate the submitted dispute. The Strider Subsidiaries' claim is very different. For it is clear on this record that the Strider Subsidiaries *did* contract with Promotora to arbitrate, that a dispute was submitted a panel of arbitrators, that the Strider Subsidiaries presented their case to the panel, and that they lost. In that posture, the arbitrators' findings are due maximum deference from this Court, and so long as their findings were explained "in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." *In the Matter of the Arbitration Between Andros Compania Maritima, S.A.,* 579 F.2d 691, 704 (2d Cir.1978); *accord Local 97, Int'l Brotherhood of Electrical Workers v. Niagara Mohawk Power Corp.,* 196 F.3d 117, 124 (2d Cir.1999)

("[T]he contractual theory of arbitration requires a reviewing court to affirm an award it views as incorrect—even very incorrect—so long as the decision is plausibly grounded in the parties' agreement.") (internal quotation marks and citations omitted).

The Strider Subsidiaries seek to vacate the consequential damages portion of the Award on grounds that it was rendered in "manifest disregard of the law." The manifest disregard standard is a high hurdle, requiring "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892 (2d Cir.1985). The court must find that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Halligan v. Piper Jaffray Inc.,* 148 F.3d 197, 202 (2d Cir.1998). Moreover, the error must have been "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Folkways Music Publishers Inc., v. Weiss,* 989 F.2d 108, 111 (2d Cir. 1993). In assessing the particulars of the Strider Subsidiaries' claim, the obligation of this Court is not to search for grounds of reversal, but to seek grounds on which to affirm.

Briefly summarized, the Strider Subsidiaries' position is that losses incurred by Promotora on account of Turbana's 1993 cancellation of the COA could not possibly have been foreseen when the final addendum to the Charters was executed. They claim that because the final addendum was executed on June 18, 1989, under the rule of *Hadley v. Baxendale* it is error to hold them liable for losses incurred under the COA, which was not executed between Promotora and Turbana until some fourteen months later.[6] But no matter how

---

**6.** The hornbook rule of *Hadley v. Baxendale,* 156 Eng. R. 145 (1854), is that for a party to

persuasively the Strider Subsidiaries present their case, "it is abundantly clear that courts must tread lightly when reviewing arbitral decisions. That a court believes an arbitrator to have committed serious legal or factual error will not justify overturning his decision, provided that the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Mohawk Power Corp.*, 143 F.3d at 715. Here, the Panel considered the same argument and found that the Strider Subsidiaries had sufficient knowledge of Promotora's operations at the time of their signing the June 18, 1989, addendum and thus "cannot now argue that the consequences of its breach were unforeseeable." (Award at 12–13). The dissenting arbitrator noted no difference with the panel majority concerning how to apply *Hadley v. Baxendale* on this record.

■ I find that the arbitrators in this case acted well within their authority and reasonably construed the documents at issue. It is uncontested that in 1986, Promotora chartered the Strider Isis and Strider Juno for the very purpose of using those vessels to charter bananas pursuant to agreements with various third-party banana producers and suppliers. Shortly after the Charters were executed, Promotora operated the Strider vessels under an initial COA with Turbana, carrying bananas from Ecuador to the West Coast of the United States and Japan. (Award at 4.) After that contract expired in 1988, Promotora entered into a three-year COA with the Chiquita Corporation for the carriage of bananas from Costa Rica to Savannah, Georgia and Wilmington, North Carolina. (*Id.*) It was therefore foreseeable (or at least plausibly so) that once the Chiquita COA expired, Promotora would execute another COA—as they did with Turbana. On that basis alone, it was not a manifest disregard of *Hadley v. Baxendale* for the Panel to conclude that as of June

19, 1989, the Strider Subsidiaries "understood from its own experience as a liner operator in the banana trade the sort of dependable performance that would be required and the consequences of a vessel's failure to maintain a reliable liner service." (*Id.* at 13.)

The issue, to repeat, is not whether this Court would apply the rule in the same way, or how it might instruct a jury; the question, rather, is whether the arbitrators refused to apply the governing law. The arbitrators here specifically cited *Hadley v. Baxendale*, correctly stated its import, and reached a reasonable conclusion about what the parties should reasonably have foreseen. (*Id.* at 11–14.) It is difficult to imagine a question on which the views of arbitrators experienced in the shipping business should be given greater deference, and it appears uncontested in this case that the panel arbitrators—two are past Presidents of the Society of Maritime Arbitrators—were "among the most experienced of all" maritime arbitrators. (Mem. Supp. Pet. Confirm at 16.)

■ Nor did the panel act in manifest disregard of the law in rejecting the Strider Subsidiaries' argument that the Turbana/Promotora arbitration precludes the award of consequential damages in this case. For starters, the Turbana/Promotora arbitration involved a different contract and a different set of facts. The issue as to damages in that arbitration was whether or not Turbana had established its amount of damages with the certainty that is required to recover lost profits. The Panel rejected Turbana's claim to consequential damages chiefly on the ground that the claim was "the product of hopeful expectation about the nature of the service and the potential of the profits to be had." (Duffy Aff. Ex. G at 18.) In the present arbitration, the issue was not whether Promotora sufficiently proved its damages to recover, but only whether its damages

recover lost profits, such damages must have been contemplated by the parties at the time

of the contract.

were reasonably foreseeable as required by *Hadley v. Baxendale.* Promotora's claimed damages were quantified in great detail and evidenced at the hearings by sixteen boxes of supporting invoices and other original documents. The only issue for the arbitrators to decide was whether the Strider Subsidiaries, with their experiences as vessel operators, should reasonably have foreseen that Promotora might contract with a third party to ship perishable bananas—for which timeliness and scheduling are critical—at the time they signed the last addendum to the Charters. The Panel carefully considered that question and determined that the Strider Subsidiaries were well aware of the operational details and requirements of Promotora's business as of that date. The findings of a different panel, in a different case, on a different set of questions, do not convince me to disturb that conclusion.

For these reasons I hold that the Panel engaged in an appropriate professional review and analysis of the factual and legal merits of this case (as reflected in the record) and did not act in manifest disregard of the law in reaching its conclusions as to the award of consequential damages. The Strider Subsidiaries' motion to vacate that portion of the Award is denied.

## CONCLUSION

The Award is vacated as to Sea Containers, Ltd., and confirmed as to Strider 9, Ltd. and Strider 10, Ltd. The Clerk is respectfully directed to enter judgment.

SO ORDERED.